## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH GIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 C 3913 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| ANNA GIL, LOUISE MAKUCH | ) | |
| REVOCABLE TRUST, GILMART, | ) | |
| LTD., GILMART II, INC., JOSEF | ) | |
| JAMROZ, BYRNE, BYRNE, & CO., | ) | |
| LOWELL INTERNATIONAL CO., and | ) | |
| EAGLE DISTRIBUTORS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Joseph Gil ("Joe") filed a twenty-one count complaint against Anna Gil ("Anna"), Josef

Jamroz ("Josef"), Waclaw Jamroz,[1] the Louise Makuch Revocable Trust ("Trust"), Gilmart, Ltd.

("Gilmart"), Gilmart II, Inc. ("Gilmart II"), Byrne, Byrne & Company ("Byrne"), Lowell

International Company ("Lowell"), and Eagle Distributors, Inc. ("Eagle").  Joseph brings claims

under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*,

against Anna, Josef, Byrne, Lowell, and Eagle, in addition to various state law claims.  The

court's jurisdiction is based on 18 U.S.C. § 1964(c) and  28 U.S.C. §§ 1331 and 1367.

---

[1] On suggestion of his death on the record, Waclaw Jamroz, a Roman Catholic priest, was
dismissed as a defendant on January 28, 2010.

Before the court are Anna's and Lowell's motions to dismiss the RICO claims under Federal Rules of Civil Procedure 12(b)(6) and 9(b).[2]  For the following reasons, the motions [#13, 23] are granted.

## BACKGROUND[3]

While married, Joe and Anna together owned and operated Gilmart, an ethnic grocery store located in the south suburbs of Chicago.  Compl. at 2.  Joe and Anna were each 50 percent shareholders of Gilmart.  *Id.* ¶ 3.  Anna was in charge of bookkeeping and bill paying.  *Id.*  Anna received over $3.7 million in excess compensation and draws from Gilmart from the time of its establishment to 2001.  *Id.* ¶ 11.  Anna took this money to avoid Gilmart's paying taxes on it and to keep money from Joe.  *Id.*  In 2001, Gilmart's tax return reflected $3,782,471.00 in cash, but this money was not in any Gilmart account.  *Id.* ¶ 11; Ex. 2 to Compl.  On Gilmart's 2002 and 2003 tax returns, much of this amount was recharacterized as a shareholder loan.  Compl. ¶ 11; Exs. 3–4 to Compl.  The IRS audited Gilmart, presumably in 2004, and declared these shareholder loans to be dividends, requiring Joe, who had never received any of the money, to pay taxes on it.  *Id.* ¶ 11.

In 2004, Anna began transferring money from Gilmart's or her own accounts to other individuals.  Around May 27, 2004, she transferred $50,000 of her own funds to her mother, Louise Makuch.  *Id.* ¶ 13.  On June 2, 2004, she transferred $235,000 from Gilmart to Makuch. *Id.* ¶ 14.  On June 3, 2004, Makuch bought commercial property in Willow Springs ("the Willow

---

[2] The Trust, Gilmart, and Gilmart II have joined Anna's motion to request dismissal of the non-federal claims if the court concludes that the RICO claims should be dismissed.

[3] These facts are taken from Joe's complaint and are presumed true for the purpose of resolving the pending motions.  The background contains references to exhibits attached to Joe's complaint and, thus, are a part thereof.  *See* Fed. R. Civ. P. 10(c).

Springs property"), making at least a $500,000 down payment using funds Anna had transferred to her. *Id.* ¶ 17; Ex. 6 to Compl.  On June 15, 2004, Anna transferred another $100,000 from Gilmart to Makuch.  Compl. ¶ 16.  On June 17, 2004, Makuch transferred $200,000 to Josef, a Gilmart employee.  *Id.* ¶ 18.  On June 21, 2004, Josef paid $196,198.35 in cash for property in Willow Springs ("the Oakwood Property").  *Id.* ¶ 19.  In 2004 and 2005, Anna also transferred over $154,000 from Gilmart to Ludka Inc., a corporation owned by Makuch, even though Ludka did not provide Gilmart with any services or products.  *Id.* ¶ 16.  In 2005, Anna withdrew over $350,000 from Gilmart to pay her personal taxes.  *Id.* ¶ 12.

On July 23, 2004, Makuch established the Trust.  *Id.* ¶ 20.  The Trust named Makuch as trustee and Anna and her brother, Andrew Makuch, as beneficiaries upon Makuch's death.  *Id.* Steven Gustafson was named successor trustee upon Makuch's death.  *Id.* ¶ 31.  The trustee was directed "to take any and all actions to ensure that any trust assets that are to pass to Anna be protected from ever benefiting Joe Gil."  Ex. 7 to Compl. § 8.01(a)(1).  Anna later admitted to having signed the Trust documents in her mother's name.  Compl. ¶¶ 21–22; Ex. 8 to Compl. On August 12, 2004, Makuch transferred ownership of the Willow Springs property to a land trust, with the Trust holding the beneficial interest.  Compl. ¶ 23.  Josef followed suit, transferring ownership of the Oakwood Property to a land trust, with the Trust again holding the beneficial interest.  *Id.* ¶ 24.

On November 2, 2004, Anna filed for divorce and sought injunctive relief against Joe, claiming he had mismanaged Gilmart, converted corporate property, breached his fiduciary duties, and interfered with contractual and business relationships.  *Id.* ¶ 25.  Anna paid her attorney, Gustafson, with Gilmart funds.  *Id.* ¶ 26.  Shortly after Anna filed for divorce, the

3

divorce court ordered Gilmart to pay Joe $2,000 a week and to pay all taxes, penalties, and interest that Joe was required to pay due to the IRS audit of Gilmart's 2001, 2002, and 2003 tax returns.  *Id.* at 3.

On August 1, 2005, Anna allegedly sent notice to Joe and herself, as the only Gilmart board members and shareholders, of three Gilmart meetings: (1) a special meeting of the Board of Directors on August 25, 2005, (2) the annual meeting of the Board of Directors on August 26, 2005, and (3) the annual shareholders' meeting on August 26, 2005.  *Id.* ¶ 27; Ex. 9 to Compl. Joe never received these notices and believes they were never sent to him.  Compl. ¶ 27.  At the special meeting, at which only Anna was present, Gilmart's bylaws were amended to reduce the number of directors to one and to change the quorum requirement for shareholders' meetings from a majority to a majority of shareholders present.  *Id.* ¶ 27; Ex. 9 to Compl.  Additionally, Joe was relieved of his duties as an officer and director.  Compl. ¶ 27; Ex. 9 to Compl.

On January 20, 2006, Anna called another special meeting of the Board of Directors, at which the Board adopted a resolution allowing Gilmart to file a Chapter 11 bankruptcy petition and authorizing Anna to perform all acts necessary for the bankruptcy.  Compl. ¶ 28.  Joe never received notice of this meeting.  *Id.*  Gilmart filed for bankruptcy on January 27, 2006.  *Id.* at 3. Joe filed two motions to dismiss the bankruptcy filing, one based on Joe's not receiving notice of the January 20, 2006 Board meeting and the other based on Anna's actions subsequent to the filing, which allegedly included gross mismanagement of the bankruptcy estate, failure to abide by filing requirements, and failure to pay domestic support and tax obligations to Joe.  *Id.* at 4. The bankruptcy court granted both motions and sanctioned Anna $65,000 personally for failing

to conduct a reasonable inquiry as to whether Gilmart was authorized to file for bankruptcy. *Id.* at 4–5, ¶ 30.

After the Chapter 11 petition was dismissed, Anna negotiated with three of Gilmart's creditors, Byrne, Lowell, and Eagle, to have them file an involuntary bankruptcy petition in exchange for preferential treatment. *Id.* ¶ 32. Byrne's vice president, Clyde Patterson, and Eagle's president, Walter Podmanski, were friends of Anna's and all three companies had long-standing relationships with Anna and Gilmart. *Id.* ¶¶ 8, 10, 32. On September 20, 2006, Byrne, Lowell, and Eagle filed an involuntary Chapter 7 bankruptcy petition. *Id.* ¶ 32; Ex. 12 to Compl. Byrne was listed on the petition as being owed $31,088, but Gilmart's accounts payable ledger did not list Byrne as being owed anything as of November 2006. *Id.* ¶ 8. Lowell was listed as being owed $59,719.70. Ex. 12 to Compl. Eagle was listed as being owed $146,566.20 in the bankruptcy petition, but Gilmart's ledger only showed $47,114.10 owed to Eagle as of November 2006. *Id.* ¶ 10. The case was converted to Chapter 11 and, on Joe's request, a trustee was appointed. *Id.* ¶ 33. On August 7, 2007, the trustee sold substantially all of Gilmart's assets to the Trust. *Id.* ¶ 34. Joe claims that, by this sale, the Trust was able to purchase Joe's interest in Gilmart for a "significantly reduced value." *Id.* ¶ 36.

Joe claims defendants violated RICO in that Anna, Josef, Byrne, Lowell, and Eagle, along with Gilmart and Fr. Jamroz, formed an association-in-fact enterprise and engaged in a pattern of racketeering activity, namely fraud. Joe alleges that "by the sale, liquidation and hypothecation of a substantial part of Gilmart's and Anna's assets, by the fraudulent transfer of Anna's assets to third parties and to the Louise Makuch Revocable Trust, and by the filing of the first Chapter 11 bankruptcy petition and manufacture of the involuntary bankruptcy petition," *id.*

¶ 37, these individuals and Gilmart "engaged in a scheme to hinder, delay and defraud Joseph

Gil, and avoid the seizure of the property, cash and other assets owned by Anna if Joseph Gil

obtained a judgment against Anna individually."  *Id.*  Joe alleges that Anna operated and

managed the racketeering enterprise.  *Id. ¶* 38.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a

claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital

Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).  In ruling on a 12(b)(6)

motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all

reasonable inferences from those facts in the plaintiff's favor.  *Dixon* v. *Page*, 291 F.3d 485, 586

(7th Cir. 2002).  In order to survive a Rule 12(b)(6) motion, the complaint must not only provide

the defendant with fair notice of the claim's basis, but must also establish that the requested

relief is plausible on its face.  *Ashcroft* v. *Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1949, 173 L. Ed.

2d 868 (2009); *see also Bell Atl.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d

929 (2007).  Allegations of fraud are subject to the heightened pleading standard of Rule 9(b),

which requires a plaintiff to "state with particularity the circumstances constituting fraud or

mistake."  Fed. R. Civ. P. 9(b).  This means that the plaintiff must plead the "who, what, when,

where, and how: the first paragraph of any newspaper story."  *DiLeo* v. *Ernst & Young*, 901 F.2d

624, 627 (7th Cir. 1990).

## ANALYSIS

To state a civil RICO claim under 18 U.S.C. § 1962(c), Joe must allege "(1) conduct (2)

of an enterprise (3) through a pattern (4) of racketeering activity."  *Midwest Grinding Co.* v.

*Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992) (quoting *Sedima, S.P.R.L.* v. *Imrex Co.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)) (internal quotation marks omitted).  "It is not enough, however, for a plaintiff simply to allege the above elements in boilerplate fashion; instead, [he] must allege sufficient facts to support each element."  *Goren* v. *New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998).  Even if it is assumed that the conduct, enterprise, and predicate act elements are adequately pled, Joe's RICO claim must be dismissed because he cannot meet the pattern requirement.

"[C]ourts carefully scrutinize the pattern requirement to forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law."  *Jennings* v. *Auto Meter Prods., Inc.*, 495 F.3d 466, 472–73 (7th Cir. 2007) (citation omitted) (internal quotation marks omitted). A pattern of racketeering activity requires at least two predicate acts of racketeering committed within a ten-year period.  18 U.S.C. § 1961(5).  Predicate acts alone, however, do not make a pattern.  "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity."  *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 240, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989) (emphasis in original).  This is called the "continuity plus relationship" test.  *Jennings*, 495 F.3d at 473.

There is little dispute that the predicate acts alleged here are related.  The Supreme Court has said that to be related the predicate acts should "have the same or similar purposes, results, participants, victims, or methods of commission" or otherwise indicate they are "interrelated by distinguishing characteristics and are not isolated events."  *H.J. Inc.*, 492 U.S. 229 at 240

(quoting 18 U.S.C. § 3575(e)) (internal quotation marks omitted).  The predicate acts involved

various participants and methods of commission, and Joe has alleged that they were all

undertaken for the same purpose, affected the same person, and ultimately had the same result–

depriving him of assets to which he is entitled.

Unlike the relatedness element, however, continuity is vigorously disputed. Continuity

can be "both a closed- and open-ended concept, referring either to a closed period of repeated

conduct, or to past conduct that by its nature projects into the future with a threat of repetition."

*Id.* at 241.  "Closed-ended continuity . . . refers to criminal behavior that has come to a close but

endured for such a substantial period of time 'that the duration and repetition of the criminal

activity carries with it an implicit threat of continued criminal activity in the future.'" *Jennings*,

495 F.3d at 473 (quoting *Midwest Grinding*, 976 F.2d at 1022–23).  Open-ended continuity

refers to "a course of criminal activity which lacks the duration and repetition to establish

continuity" but where the past conduct "by its nature projects into the future with a threat of

repetition." *Jennings*, 495 F.3d at 473 (citations omitted) (internal quotation marks omitted).

Joe maintains that his allegations satisfy either test of continuity.  In considering whether

closed-ended continuity exists, the court should consider "the number and variety of predicate

acts and the length of time over which they were committed, the number of victims, the presence

of separate schemes and the occurrence of distinct injuries." *Morgan* v. *Bank of Waukegan*,

804 F.2d 970, 975 (7th Cir. 1986).  Joe has alleged that defendants' scheme to defraud him was

accomplished through more than several interstate telephone conversations, letters, and other

remittances sent through the United States mails, beginning at least by the spring of 2004 and

continuing through or beyond August 2007, when the assets of the bankruptcy estate were

transferred to the Trust and sold, a period of time that can be considered substantial.  *Cf. Midwest Grinding*, 976 F.2d at 1024 (nine-month scheme was insubstantial).  But other than the number of acts and the overall duration of the scheme, Joe's allegations do not paint the kind of continuing racketeering activity that is necessary to establish a RICO pattern.  There was but one scheme–that of diverting money from Joe through the various funds transfers and transactions, ending with the discharge injunction in bankruptcy that prevented him from recovering his share of the value Gilmart's before the enterprise undertook the fraud; one victim–Joe; and one type of injury–the deprivation of assets to which he is entitled.  There is no indication that the duration and repetition of the criminal activity carries with it an implicit threat of *continued* criminal activity in the future.  Rather, the enterprise accomplished its purpose and no longer exists.  The cases are legion rejecting RICO claims of this sort.  *See, e.g.*, *Jennings*, 495 F.3d at 475–76 (allegations did not establish continuity where there was only one victim, one injury, and one scheme); *Midwest Grinding*, 976 F.2d at 1025 (same); *see also Talbot* v. *Robert Matthews Distrib. Co.*, 961 F.2d 654, 663 (7th Cir. 1992) (allegations of a single scheme over a period of years did not establish a sufficient pattern where there was but one scheme and indistinct injury[4]) (dicta); *J.D. Marshall Int'l, Inc.* v. *Redstart, Inc.*, 935 F.2d 815, 821 (7th Cir. 1991) ("Although there is no requirement that a RICO pattern must include multiple schemes and victims, the fact that [defendant's] alleged violations constituted a single scheme–purportedly to recover its money from [plaintiff]–involved a single victim–[plaintiff]–and were predicated upon a single

---

[4] Indistinct injury would follow inevitably from the existence of a single scheme, as there would be no other scheme that could cause a distinct injury from the single scheme.

9

transaction–the Purchase Agreement– informs our judgment.").  As such, Joe cannot allege a closed-ended pattern of racketeering activity.

Although inconsistent with his position that the racketeering activity is closed-ended, Joe also argues that he has sufficiently alleged open-ended continuity.  Open-ended continuity can be established by showing "(1) a specific threat of repetition, (2) that the predicate acts or offenses are part of an ongoing entity's regular way of doing business, or (3) that the defendant operates a long-term association that exists for criminal purposes."  *Midwest Grinding*, 976 F.2d at 1023 (citation omitted) (internal quotation marks omitted).  Joe argues that Anna's past conduct indicates that she will continue to act in a way to deprive him of funds to which he may be entitled.  Joe's expectation, however, does not constitute a *specific* threat of repetition.  He does not and cannot allege that the defendants' association in fact is an ongoing entity, much less that it has a regular way of doing business, or that the defendants operate a long-term association that exists for criminal purposes.  Indeed, all that appears from the complaint is that half of Gilmart belonged to Joe and that Anna, through her allies, deprived him of the fair value of his half.

Because Joe cannot allege closed- or open-ended continuity, he has failed to allege the pattern of racketeering activity required to state a claim under § 1962(c).[5]  Thus, his RICO

---

[5] Joe has also brought counts against Anna under 18 U.S.C. § 1962(b), which provides that it is "unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce," and against defendants under 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)" of § 1962.  Because the court finds that Joe cannot establish a pattern of racketeering activity and this element is essential to all RICO claims, all counts brought under RICO will be dismissed.

claims must be dismissed.[6]  Like so many unsuccessful RICO claims, this case appears to be a

fraud case (or a divorce settlement feud), garden variety or otherwise,  that belongs in state court.

The court declines to exercise supplemental jurisdiction over the remaining state law

claims.  *See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental

jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has

original jurisdiction . . . ."); *Groce* v. *Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir.1999) ("[I]t is

the well-established law of this circuit that the usual practice is to dismiss without prejudice state

supplemental claims whenever all federal claims have been dismissed prior to trial.").  As such,

---

[6] It also appears that the RICO claims would be barred by RICO's four-year statute of limitations,
which begins to run when the plaintiff discovers his injury or should have discovered it if diligent, even if
the plaintiff has not yet discovered the pattern of racketeering.  *See Rotella* v. *Wood*, 528 U.S. 549,
554–55, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000); *McCool* v. *Strata Oil Co.*, 972 F.2d 1452, 1464–65
(7th Cir. 1992).  Joe has pled facts indicating that he knew or should have known of his injury at the time
of the IRS audit in 2004 or least by the divorce proceedings in November 2004, more than four years
before he filed his complaint on June 29, 2009.  That other predicate acts occurred within four years of
filing does not allow Joe to recover under either a theory of a continuing violation or the separate accrual
rule, as these acts only aggravated his injury and did not give rise to a separate injury that would be
independently actionable.  *See Klehr* v. *A.O. Smith* Corp., 521 U.S. 179, 117 S. Ct. 1984, 138 L. Ed. 2d
373 (1997) ("[T]he plaintiff cannot use an independent, new predicate act as a bootstrap to recover for
injuries caused by other earlier predicate acts that took place outside the limitations period."); *Limestone
Dev. Corp.* v. *Village of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008); *McCool*, 972 F.2d at 1465 &
n.10 (separate accrual rule applies to new acts by the enterprise that cause new injuries, but "[d]ifferent
injuries flowing from the same conduct are not usually actionable in separate lawsuits.").  Equitable
tolling would not apply as Joe's pleadings establish that he did not exercise reasonable diligence in
seeking to discover the alleged pattern of racketeering activity.  *See Cada* v. *Baxter Healthcare Group*,
920 F.2d 446, 451 (7th Cir. 1990) ("[Equitable tolling] permits a plaintiff to avoid the bar of the statute of
limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of
his claim.").  The provision in Anna and Joe's marital settlement agreement reserving claims related to
Gilmart and dissipation by either party also does not appear to operate as a tolling agreement with respect
to any RICO claim Joe would have against Anna.  The court need not, however, decide this issue, as it
has found that Joe cannot allege the pattern element of a RICO cause of action.

the court will dismiss the state law claims without prejudice for lack of subject matter jurisdiction.

## CONCLUSION AND ORDER

For the foregoing reasons, the motions to dismiss of Anna Gil, the Louise Makuch Revocable Trust, Gilmart Ltd., and Gilmart II, Inc. [#13], and Lowell International Company [#23] are granted with prejudice as to the RICO claims and for lack of jurisdiction as to the state law claims.  Although not all parties have appeared, the court on its own motion dismisses claims against all remaining defendants as stated herein.  This case is terminated.


Dated: March 3,  2010                    Enter:  _____

                                                            JOAN HUMPHREY LEFKOW
                                                            United States District Judge